This morning, and the first one is number 24 1679 Migliore v. Vision Solar. Mr. Mills, please take your time and whenever you're ready, you may approach the lectern. Before I begin, Your Honors, I'd like to reserve three minutes for rebuttal.  May it please the court and good morning, Your Honors. This is my name is Andy Milts. I'm from the Flitter Milts firm in Cherry Hill. I represent the plaintiff, Eva Migliore. In this matter arising under New Jersey's Consumer Fraud Act and the Fair Credit Reporting Act. Do we have jurisdiction here? We do, Your Honor. Yes, the court does have jurisdiction. We made it very clear that we stood on the allegations of our second amended complaint, indicating that really it was impossible for us to amend any further. And, you know, that solidifies the question of whether the claims against the bankrupt entities, et cetera, you've foresworn all of those. Correct, Your Honor. We voluntarily gave up those claims. Okay. So there's no worry about piecemeal appeals or the case coming back to court after a bankruptcy stay is lifted. Nothing, nothing like that. Okay, go on. Thank you, Your Honor. You have a... So this case presents a troubling... You have a sympathetic client, but the way to show that there's vicarious liability requires about five elements. It looks like you may not be meeting three of them. You want to address those elements and tell me why I'm wrong? Well, Your Honor, we believe we meet all the elements here. You know, this sales agent was the only person there on the scene of the sale, the only person that interacted with Ms. Migliore. If he was not there, this deal could not have happened. There would be no loan, there would be no hidden contract, and there would be no transaction. So... Let me focus on Cross River for a minute. Does it matter that Cross River wasn't a party to the FPA? That Cross River wasn't... We believe, Your Honor, and we've pleaded that there's a separate agreement between Cross River and Sunlight Financial. We believe we should be able to discover that. But in any event, that salesman who was there at Ms. Migliore's house that day was there transacting on behalf of Sunlight Financial. The funding did come from Cross River Bank, and there's a separate program agreement between Cross River Bank and Sunlight Financial that articulates a lot of the same type of elements of control and marketing and things of that nature that would equally apply here. So we haven't been given the opportunity to conduct that discovery. All we've done was plead all the facts we can sufficiently plead at the time. I will say that the Attorney General of Minnesota in an action against Sunlight Financial, that came to light after the pleadings in this case were filed and the court issued its opinion, did put forth facts indicating that, yes, these funding companies that Sunlight Financial involves are related in the transaction as well and gives us the understanding that there is a separate agreement between Sunlight Financial and Cross River Bank. I do want to hear you finish your answer to Judge Ambrose's question after that. You know, there are multiple elements for agency or precarious liability. Is there control here? Is there day-to-day control of the sales agents? I'm not seeing it. There certainly is, Your Honor. And in paragraphs 31 through 42 of the complaint and other paragraphs throughout the complaint, including 61, 95, 102, you know, probably close to two dozen places in the complaint where we do articulate that there was control. The salesperson could only offer certain loans. They were allowed only to market the loans in ways that were approved by Sunlight Financial. Sunlight Financial had control over the training of the sales agents, a mandatory training session as well as supplemental trainings. All that's provided for in the— They did some training. They prepared some training materials. But how is that the same as day-to-day control? As opposed to supervisory control. Well, it's day-to-day control because the salesman was only able to offer what Sunlight said he could offer or do. The most prominent feature of this day-to-day control is the fact that Sunlight required the of its platform, its loan platform. So when the sales agent went to the consumer's door, everything had to be conducted on this sales platform. This sales platform allowed for the credit pull. This sales platform allowed for these electronic contract documents to be created. The sales platform allowed for the salesman to create a bogus email address by which the platform would send those contracts to the fake email address where he could commit the forgery. And this is something that Sunlight Financial knew about. And it was foreseeable because other allegations of this very type of misconduct have been made, not just against Sunlight Financial, but against other actors in the solar industry. I'd like to say that this case is a one-off, but it's not. It's emblematic of what's happening in this industry where sales people armed with this powerful electronic equipment go to unsuspecting consumers' doors and pull their without consent, which acts as a key to open up these loans that they could put consumers in. And then because everything's paperless and electronic, they can very easily hide these documentations by use of Sunlight's platform. So I would say the platform is probably the most substantial element of the day-to-day control because it's involved in every single one of these transactions. I worry, though. I mean, I don't see a dividing line between that and, you know, Ford has dealerships where some salesman has the paperwork that where, you know, maybe the salesman lies about the cars. Maybe he's got the paperwork to oversell all kinds of options. But, you know, Ford or whichever automaker is not telling them to do it, not making them do it, not checking on whether they're doing it. I don't see, I mean, sure, the iPad makes it easier, but you're suggesting all kinds of liabilities simply by virtue of hiring a salesman. I don't understand where the, what the stopping point is. The distinction, Your Honor, is in the fact that Sunlight puts the tools of the fraud in the salesperson's hand, this loan portal. How is that not true of conventional dealerships or multi-level marketing systems? I'm not aware of that in any of those circumstances, Your Honor, or facts, you know, that would be, would equate to this. A good example is the credit pool. Like I said, it's the key to the fraud. If it were not for Sunlight's platform, this salesperson could not have requested Ms. Migliore's credit report without her consent. And that really opened the That's down the line. I mean, coming back to the, are you an independent contractor acting for a principal, or in fact, I'm sorry, are you an agent acting for the principal, or are you an independent contractor? The financing program agreement, does it not say that the putative lenders and the solar, the party that actually does the installing, are not acting as for one another? In other words, the agent is not acting for the principal. It says that to an extent, Your Honor, but there's an important disclaimer in that section that Your Honor's quoting, which is FPA Section 16.8. That section says, each party is an independent of the other party, and neither party shall have any authority. It shall not represent that it has the authority to assume or create any obligation expressed or implied on behalf of the other party. And this is what's important. Quote, except as may otherwise be specifically be provided in this agreement. What is otherwise specifically provided in the agreement? The agreement, Your Honor, and I'll cite Judge Mariani's opinion who quoted the same opinion in the Lopez case. There's at least seven different areas in the FPA, the program agreement, where indicia of agency were found by Judge Mariani. In this very same agreement on the the Sunlight, the financing agreement provides the right to control the sales agent's marketing. The Sunlight and Suntec agreed to use commercially reasonable efforts to integrate their respective processes and technology platforms. Again, that's the loan platform I discussed. The right to control the marketing materials, which is paragraph 8.1a. The right to require the sales agent to comply with any and all policies and procedures mandated by the lender or by the Sunlight. Can the sales rep approve a loan application? I believe the underwriting is done instantaneously and electronically by algorithms used by Sunlight. What we have here is the agent requesting the credit report, utilizing the platform to create loan documents the consumer never sees, and then the salesman forging those documents. If it wasn't for the sales platform, none of this could have happened. It's the sales platform putting that tool in the hands of the sales agent, which creates the control and the liability. Billership that has computer systems where people run credit reports. Salesman there can forge documents, do other things, etc. I want to know about agency here. Can the salesman bind Sunlight Financial or Cross River Bank? The salesman is not an agent of them. The contract has to go to them for them to accept, doesn't it? The contract must meet certain standards that are issued by Sunlight As far as the terms that are inputted into the contract, the signing of the contract, those elements are under the control of the sales agent. But the Sunlight Financial has to get a credit report in order to make a decision. Yes. So it has to make its own decision. The sales rep doesn't make it for Sunlight, does it? Well, the sales agent is the one there to get the authorization for the credit pool. And if they don't have that authorization, this court wouldn't be the first court to hold that that lack of authorization is imputed onto Sunlight Financial and Cross River, the entities that did pull the credit report. So what we're alleging here is there was no authorization. There was no permissible purpose for the credit pool to begin with. And isn't your primary claim against Vision Solar and possibly its CEO? We did have claims against Vision Solar and the CEO. It's part of an integrated sales operation. Did you abandon those claims? We did, Your Honor. And why was that? Because Vision Solar filed for bankruptcy and did not emerge from the bankruptcy. So, you know, it was impossible for us to proceed against them at that point. And what about the CEO? The CEO is the one that is in charge of  We dropped the claims in order to bring these claims to this court and have a final order that was appealable here. The CEO, his name appeared on forged documents that were submitted to the state of New Jersey. It was a separate basis for our claims on the CFA. Has the New Jersey Attorney General's Office done any investigation of this? I'm sorry, Your Honor? Has the New Jersey finance practices with its finance partners? Yes, the Attorney General has. What was the outcome of that? I believe there was a consent order entered against Vision Solar. So, you know, courts throughout the country have found agency under these circumstances. I mean, we cite the Brown case. We cite the Lopez case. We cite the Riley case. All of those cases have facts that are really analogous to what we have here. We've got a salesman who approaches an unsuspecting consumer, pulls their credit report without consent because of the devices that they're on. Counsel, let me just follow up on the devices one more time. Judge Bevis mentioned this, and I just want to follow up on it. 20 years ago, you go to get a car, you get a bunch of printouts, you have to sit there and sign the printouts. You go get a car today, it is not that way. You pull out an iPad, you use your finger to sign, you scroll up really fast, click I accept, and you go on your way, much like the platforms that you're talking about. I want to understand the implications of what you're asking us to do. If we agree with you, does that mean that every salesperson at a Ford dealership, Ford Motor Credit is responsible for whatever they may do at that Ford dealership because they use an iPad? Yes, if it's done without the consumer's authorization, without a permissible purpose. If that salesman forges electronic documents on Ford's proprietary loan processing system, yes, because Ford is putting the tools of the fraud in the salesperson's hands. So yes, I would think the same analysis applies. I hope that wouldn't happen. It's happening with rapidity and it's happening quite frequently in the case of door to door solar sales. If it starts happening in auto dealerships, I would imagine the same kind of claims being brought against car dealers and lenders if it's Ford Motor Credit. If it's Ford claims against Ford Motor Credit as well. All right. Anything else? Thank you very much. We'll have you back on rebuttal. Thank you, Your Honors. Ms. Barber, take a moment. Tell us when you're ready. Good morning, Your Honor, and may it please the Court. Katie Barber for Sunlight Financial and Cross River Bank. Ms. Migliore is going after the wrong companies. Vision Solar is the company here uses door to door sales to market, sell, and install solar panels. And it is Vision Solar's salesperson who allegedly lied to Ms. Migliore and allegedly forged her signature on the loan documents here. The District Court held that Ms. Migliore's claims against Vision Solar and its owner could proceed. It denied their motions to dismiss. And I'd like to clarify, I think there are two different Vision Solar entities involved here, only one of which I'm aware was in bankruptcy. That was Vision Solar NJ LLC. And I believe that it, or I'm sorry, I think it was Vision Solar LLC that was in bankruptcy. Vision Solar NJ was the one with the motion to dismiss that was denied. And then Ms. Migliore voluntarily dismissed the claims against that Vision Solar entity and its owner, Mr. Siebert, without prejudice. Is the non-bankruptcy entity still in existence? I am not sure, Your Honor. I don't know. But from my knowledge, the other Vision Solar entity is still in existence. Mr. Siebert is still there. You say the other, do you mean the LLC or the NJ? I'm sorry? You said the other Vision Solar entity is still in existence. Yes, I believe that it is. And I'm sorry, I just, I will double check. There was the Vision Solar NJ and I was just trying to confirm which one you're talking about. Yes, I'm sorry. So Vision Solar NJ is the one that proceeded to have a motion to dismiss denied in its entirety by the district court. And then the Vision Solar NJ LLC, the claims against it were voluntarily dismissed without prejudice after the district court entered its order granting our motion to dismiss and denying Vision Solar's and Mr. Siebert's motion to dismiss in part. So those were the claims that Ms. Migliore could have proceeded on in the district court and she chose not to. We're here instead on her appeal of the district court's decision to dismiss the claims against Sunlight and Crossover Bank, which are a bank and a financial technology company that do not market, sell, or install solar panels. Instead, they simply facilitate lending for all kinds of home improvement projects. And so the district court's decision to dismiss those claims was correct and this court should affirm. This appeal really boils down to whether Ms. Migliore plausibly pled that Vision Solar's salesperson was acting as an agent of Sunlight and Crossover when that salesperson allegedly offered her solar panels for free to be installed by Vision Solar and then allegedly forged her signature on loan documents that she claimed she never saw. And she simply did not plausibly plead agency here. Her allegations really boil down to what the FPA says, that governs the relationship between Vision Solar and Sunlight. Should our analysis for the Consumer Fraud Act and Fair Credit Reporting Act basically be the same? Is this all governed by traditional agency principles? I think a lot of it really does all boil down to agency. When you look at Ms. Migliore's arguments on the FCRA claim, they really come back to her alleging that there was an agency relationship and so knowledge of the alleged fraud should be imputed to Sunlight and Crossover Bank. That's really the only basis on which she argues there was a lack of permissible purpose or there was negligent or willful wrongdoing. So I want to hear your response to Appellant's counsel's argument. Seems to say, look, this is a cleverly drafted arrangement. They set up the scheme, they set up the iPad, they have plausible deniability, but the way that the everything is set up, it's almost tailor-made for turning a blind eye to a salesman's fraud. What would you say in response to that? I would say that there would need to be more allegations that would plausibly set out that kind of scenario. They plead that there was some kind of notice that Sunlight and Crossover would have that there was this alleged wrongdoing happening with Vision Solar, but the only specific facts they point to are all events that post-date the alleged transaction here. So the complaint points to a 2023 investigation by the Connecticut Attorney General. It points to a 2023 lawsuit. Nowhere does it point to anything 2022 and before that would have put Sunlight and Crossover on specific notice that Vision Solar's salespeople were engaging in the kind of alleged misconduct that happened here. The same question I asked of your proposing counsel. The New Jersey Attorney General's Office reportedly did some type of investigation, did it not? I'm not aware of that, Your Honor. And if it did, and I'm not aware of any investigation against Sunlight and Crossover Bank. I think that's the difference here. If Vision Solar is, a lot of the lawsuits that Ms. Migliore is pointing to involve just the solar panel seller and salesperson. They do not involve the lending and financing. There's been nothing related to Sunlight? I'm sorry? There's been nothing related to Sunlight? I believe there were, there are a couple other cases that involved Sunlight. I believe there's the main one that Ms. Migliore relies on is the Lopez case is probably the closest case where Sunlight was involved. And that's from a district court in this circuit, but it's on Pennsylvania law as opposed to New Jersey law. That's correct. What's the difference in terms of the laws? I'm not sure there is much difference. I think that, frankly, the court there got it wrong because it just accepted the plaintiff's characterization of the FPA in that case. It does not appear to have actually examined the provisions and the actual text of the FPA. When you read that opinion, it just, it takes kind of the plaintiff's characterization of what those provisions said. In the same way that Ms. Migliore's complaint here makes these kind of blanket conclusory assertions of agency that there was a right to train and control. And those are all premised on the FPA. I mean, you actually look at what the provisions of the FPA say. They do not show the level of control, day-to-day control and supervision that is required for agency. So all they show is that there was, Sunlight did provide some training sessions, but there are separate provisions that say that it was Cross River who was responsible. And I believe that's in 8.1... Vision Solar. I'm sorry. Yes. Vision Solar. I'm sorry. That it was Vision Solar who was responsible. Is that a Freudian slip? I'm sorry? No, Your Honor, surely not. I think when you look at 8.1c and d, and you contrast the language of those provisions with, I believe it's 9.1b, which is what requires Sunlight to provide those training sessions. When you look at 8.1c and d, those provisions say that Channel Partner, which is Vision Solar, Vision Solar shall be responsible for ensuring that all employees and third-party sales organization employees involved in marketing loans receive compliance training. And similarly, 8.1c says, Channel Partner, Vision Solar shall be responsible for ensuring that the marketing of systems and loans complies with all applicable law, including applicable law governing door-to-door sales. So when you line those provisions up next to each other, you see the difference where it's Channel Partner, it's Vision Solar that has the responsibility for ensuring that its salespeople, its employees and agents receive the training. Sunlight provides some training to ensure that there's compliance, but they are not responsible for policing compliance and ensuring that these salespeople are acting in accordance with law. So your clients don't maintain any claim against Ms. Migliore, do they, on the loans or anything else that were, you know, fraudulently made in her name? If I understand the question, do you mean there's any kind of affirmative effort to collect on the loans or? Does your, do your clients still reserve the right to try to collect against Ms. Migliore? I think at this point they do, Your Honor. And I think what's happening there, we're at the pleading stage. And so, of course, here we're accepting as true Ms. Migliore's allegations. But if you look at some of the briefing below, Vision Solar NJ's motion to dismiss involved a recorded phone call between who they believe to be Ms. Migliore and Vision Solar that they believe reflects that she did voluntarily enter into the loan. And so there is some basis for the defendants here to believe that. But she never signed an agreement, right? According to her allegations. I think there is some basis for the defendants to believe that her allegations are not well-founded. You can see why there are investigations around the country. In this area of lending, there appears to be a taint of what appears to be unconscionability. And courts are trying to do something that basically helps persons like this who purportedly did not sign an agreement to be charged $99,000 or whatever the amount was here for something that they apparently didn't need because of the tree foliage in the area. And yet the son finds out, lo and behold, his mother is supposedly liable. And you're telling me that they, do they intend to try to collect on this? I think at this moment, they believe that the loan is enforceable. And were there to be other facts to emerge that would show that there was, that say her allegations were founded in fact, then they would take a different position, I think. At this moment, the position has been that they believe that they don't necessarily credit her allegations. But again, I think the concern that you're speaking to, Judge Ambrose, is well-founded, but it doesn't apply to this case. For one, again, we are just not the right defendants here. Ms. Migliore had viable claims. The district court found that she had viable claims that could have proceeded into discovery against the actual seller of the solar panel, who I think it seems undisputed that that entity employed the salesperson who is allegedly responsible for this misconduct. So she did have recourse here. And for whatever reason, she chose to pursue sunlight and cross river instead. And there may have been, in a different case, another way to do that. But the way she chose to pursue that is based on an assertion of agency. And she just has not plausibly pled an agency relationship here. Because it... Ms. Berger, let's imagine that... Barbara, sorry. Let's imagine that plaintiff's allegations added some things. Let's imagine that the plaintiffs also alleged that there was an email or recording of a conversation between, you know, head of business development for Sunlight Financial and Cross River Bank and Vision Solar that said, we want you to be, you know, get the most aggressive salesman. And, you know, I don't care if you need to, like, twist people's arms or make it up. Just go ahead and get signed contracts back to us. Would that be actionable? Would that potentially be enough for vicarious or agency liability? I'm not sure that would be enough for vicarious or agency liability. I think you'd still have to show day-to-day control. Now, could there be a claim for potentially civil conspiracy or some other sort of direct liability, potentially? But again, that's not what's pled here. And there are no allegations of that kind of agreement or working in tandem. And again, I think it comes back to whether Sunlight and Cross River had control over how these agents conducted the marketing and sales on a day-to-day basis. And the only facts that Ms. Miliori has on that front are from the FPA. Her complaint is entirely centered on the FPA. And the FPA just plainly shows that there was not that control. Are you aware of other suits against your clients that have alleged such facts? I am not, Your Honor. Or anything that's emerged in discovery in other cases that has brought forward such facts? I will admit I don't know the whole universe of the litigation. I think Ms. Miliori has put out there what she's aware of. Her counsel's involved in a lot of these lawsuits. And having looked at all of those other cases that she references, I have not seen anything that is- What were the facts in Lopez? I think they were very similar to here, Your Honor. But again, it came back to what the FPA said. And the court there, I think, decided the agency question based exclusively on how the plaintiff characterized the FPA, which I think were just not accurate characterizations of what the text of the agreement actually said. Is it the same FPA used in Lopez as was used here? I believe that it is. Yes, Your Honor. I'm not sure that the FPA was in question, was actually presented to the court in that case. It was clearly incorporated into the plaintiff's complaint there. But the district court there, just in discussing the FPA, did not reference the FPA directly. It referenced the plaintiff's complaint and her allegations characterizing the complaint. Thank you. Thank you, Your Honor.  So I want to address Judge Bevis's question about whether Sunlight's still trying to collect on this. And that question really underscores the policy behind why these disclaimers of agency shouldn't apply. The policy is that it would be unjust to allow a principal to put an agent into the marketplace to accept the benefits of this fraudulent transaction, i.e. the fact that Ms. Muguior is on the hook for a $99,000 loan and then disclaim any agency relationship after the fact. So it underscores the policy why courts don't give credence to those self-serving labels. Not at all. She made very clear. Look, if the agency stuff is proven, then it was clear. You wouldn't try to collect. It wouldn't be collectible. But at the moment, these are allegations. They're not proven yet. But let's say you have a salesman who uses high-pressure sales tactics and the dealership gets a sale. You're suggesting that it doesn't require control or anything to have liability. And that's just contrary to bedrock agency law. If someone benefits from a transaction, he's automatically liable? We're not addressing that at all, Your Honor. What I'm saying is that self-serving disclaimers of agency shouldn't carry weight, that the court should look at the conduct of the parties, should indeed look at the fact that Sunlight Financial put the tools for the fraud in the salesman's hand here. Another point I want to make is, you know, we should be entitled to discovery on these things. Yes, we have pleaded two dozen allegations in our complaint, including incorporating the FPA and the multiple places in the FPA where control is established. We were not provided that. The non-bank solar entity, non-bankrupt solar entity, you dropped the claim against them as well. Is that correct? That's correct, Your Honor. And the reason for that? It would just be impossible and futile to go after them at this point. It would be uncollectible for our client. It would just be an exercise in futility. The CEO, though? Pardon me? The CEO of the bankrupt entity? The claims were based on different facts against the CEO, Your Honor. There were certain documents submitted to the state of New Jersey that bore his signature. Those documents were forged, and we had claims based on that against the CEO. Once the claims were dismissed, it was best to direct our appeal to these companies who are directing. I understand that. But the problem with your theory is the bedrock of our system is one of limited liability corporations and separation. And I don't understand where this is going to stop with every lender being on the hook. Now, if these lenders had set this up to turn a blind eye, you know, Ms. Barber was willing to admit there might be other bases of liability. You haven't alleged anything like they're, you know, having either intending or having a nod and a wink towards a fraudulent scheme. It's just they set up stuff that made this possible. And I don't see a distinction between this and car salesmen who use iPads who could just as easily be benefiting Ford Motor Company without Ford Motor Company's encouraging it or involving the Ford Credit Company. So I see no limiting principle for your argument. There's a need for foreseeability, Your Honor. If it's possible for these finance companies to foresee this type of fraud happening. That is not in the restatement of agency. Should we deviate very markedly from the restatement of agency? Well, no, Your Honor. We're stuck with Winback, right? Winback is the controlling case, yes. And so you have to have, you have to conduct and conclude transactions for the principal. Correct. You have to have the power to speak and hold yourself out as representing the principal. The principal controls how its company is represented to third parties. The principal financially benefits from the contracts. And the agent is a fiduciary for the principal. And here you have an FPA that specifically disclaims agency, disclaims fiduciary duties. And the sales rep for the Vision Solar entities cannot conduct and conclude transactions. So under Winback, how do we possibly, I mean, how do we say that there is an agency relationship here? Respectfully, Your Honor, I think I've said this a bunch, this self-serving label, disclaiming agency should not be given any effect by this court, but rather the court should look at the conduct of the parties and their actions. And that's right out of New Jersey Supreme Court, the Sears mortgage case. Also, Winback says that a principal will be held liable for the independent contractor agent's misrepresentations upon matters which the principal might reasonably expect would be the subject of representations, provided the other party has no notice that the representations are unlawful. There are parent authority situations where someone, you set someone up, if you set someone up with a badge that said Sunlight Financial or Cross River Bank or something else, and Sunlight Financial, Cross River Bank business cards, we might have a different case. But there's no allegation that they said, hi, I'm with Sunlight Financial and Cross River Bank. Well, all we have is one person appearing at the doorstep for all three of these entities involved in this transaction. If he wasn't there representing all three of these entities, who would be there on their behalf? There wouldn't be anyone there to forge Ms. Migliore's signature. There wouldn't be anybody there to hide the contracts from her to further this that they would benefit from later. If we rolled the clock back 20 years, you might have a conceivable claim because that was the test in the Connolly test. But once you hit Iqbal and Twombly in 2007 and 2009, the allegations you make have to be plausible. And you have to have a little, you have to have more evidence put into the complaint in order to pass muster. So if something's conceivable, if you had discovery, perhaps. But here you have an entirely different standard. And that really takes a lot of cases out of play for plaintiffs. So what have you alleged that is plausible with respect to the agency relationship? We pleaded, Your Honor, that there's a technologically integrated arrangement here between Vision Solar and Sunlight Financial, where Vision Solar's sales agents, including the sales agent here, had the ability to access Sunlight Financial's platform in order to commit this fraud. That's one aspect of it. Another is the training. The training, that person has to be- We have a case that specifically says training is not enough. They have the right to terminate an employee of Vision Solar. If one looks at the same section that my adversary quoted, section 1681, if you look at section D and E, Sunlight Financial itself retained the authority to terminate sales organizations in section E. Sales organization in section D is defined as employees of channel partner Vision Solar and third-party sales organizations. Both are labeled as sales organizations. But the right to terminate is not the same thing as day-to-day control. The right to terminate- It sounds like if I say you and I have an agreement and go out and see what you can find in terms of my financing, the types of transactions that you find, and then I will make a decision as to whether I wish to do it. That doesn't sound like a principal-agent relationship. That's not the facts here, Your Honor. Ms. Migliore was told this was free. The salesman omitted any mention of a loan or finance transaction altogether. And those documents, the loan documents that were created were then hidden from her. So then there's no apparent authority. She doesn't appear to be working on behalf of either lender. He appears to be working just on behalf of Vision Solar. And then there are other lenders in the background. If it said something about a lender, you might have an apparent authority-type claim, but you don't. Well, if the salesman said something about a lender, I would imagine that the customer's ears would have gone up and would have thought, okay, what do you mean, lender? Is there a loan here? But no, none of that was mentioned. This loan was opened surreptitiously by a salesman who had credentials to access Sunlight Financial's system in order to commit the fraud. So I understand Your Honor's concerns about this expanding to other factual scenarios, but we're stuck with the facts we have here and pleaded in the complaint, which means that we should be entitled to discovery to determine how Sunlight Financial was on notice of these type of things and the elements of control. Right now, we could only plead the facts we pleaded in the complaint. We ask the court to reverse the district court and allow us the opportunity, like so many other courts have, to establish those claims through discovery. Thank you, Mr. Mills. Thank you, Your Honor. We thank both counsel for the helpful briefing and oral argument to take this matter under advisement.